UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,    )
                             )
         Plaintiff,          )
                             )
    v.                       )      No. 4:09 CR 145 ERW
                             )                      DDN
MATTHEW MEES,                )
                             )
         Defendant.          )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court upon the pretrial motions of the parties which were referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b).

Before the court are the motions of defendant Matthew Mees to dismiss Count 2 of the indictment because it is based on an unconstitutional statute (Doc. 21), and to suppress evidence and statements (Docs. 13 oral motion, and 22 documentary motion); and of the United States for a determination of the admissibility or not of any arguably suppressible evidence (Docs. 10 documentary motion and 14 oral motion). An evidentiary hearing was held on April 9, 2009.

**I. MOTION TO DISMISS INDICTMENT**

Defendant Mees has moved to dismiss Count 2 of the indictment because it is based upon 18 U.S.C. §1466A(b)(1), which, defendant argues, is unconstitutionally vague and overbroad.

Count 2 alleges that, between January 1 and September 13, 2008, defendant Mees possessed "material that contained a visual depiction that depicts a minor engaged in sexually explicit conduct and is obscene and that was produced using materials that traveled in interstate commerce. . . . In violation of Title 18, United States Code, Section 1466A(b)(1)." (Doc. 1 at 4.) Section 1466A(b)(1) provides:

> (b) **Additional offenses.--**Any person who, in a circumstance
> described in subsection (d), knowingly possesses a visual
> depiction of any kind, including a drawing, cartoon,
> sculpture, or painting, that–

> (1)(A) depicts a minor engaging in sexually explicit conduct; and

> > (B) is obscene . . . shall be subject to the penalties provided. . . .

18 U.S.C. § 1466A(b)(1). Subsection (c) further provides, "It is not a required element of any offense under this section that the minor depicted actually exist." 18 U.S.C. § 1466A(c).

Mees argues that § 1466A(b)(1) is unconstitutionally vague and overbroad, and runs contrary to <u>Ashcroft v. Free Speech Coalition</u>, 535 U.S. 234 (2002). More specifically, Mees argues that the statute violates the Due Process Clause of the Fifth Amendment because it is impossible to enforce because fictional characters that depict minors have no real human age and it would be impossible for a jury to determine as a fact the age of a non-existent person. (Doc. 21.)

In response, the United States argues that the statute is not unconstitutionally vague or overbroad. In particular, the government argues that a jury can determine the age of the person depicted and the defendant's mental state. The government also notes that this statute prohibits obscene materials, not child pornography, which makes any reliance on <u>Ashcroft</u> misplaced. (Doc. 24.)

### A.  Attack under the First Amendment

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech. . . ." U.S. Const. amend. I. This freedom allows for the free trade of ideas, and necessarily includes ideas that most people might find distasteful or discomforting. <u>Virginia v. Black</u>, 538 U.S. 343, 358 (2003). The government may not prohibit speech or expression merely because society deems it offensive or disagreeable. <u>Id.</u> That said, the protections of the First Amendment are not absolute. <u>Id.</u> There are several categories and classes of speech which the government may restrict and regulate without infringing constitutional rights. <u>Id.</u> at 359. These categories include fighting words, threats of violence, words that tend to incite an immediate

breach of the peace, obscenity, and child pornography. <u>United States v. Williams</u>, 128 S. Ct. 1830, 1835-36 (2008); <u>Id.</u>

Obscene speech consists of sexually explicit material that violates fundamental notions of decency. <u>Id.</u> at 1836 (citing <u>Roth v. United States</u>, 354 U.S. 476, 484-85 (1957)). Child pornography consists of sexually explicit visual portrayals that feature children. <u>Id.</u> (citing <u>New York v. Ferber</u>, 458 U.S. 747, 751-53 (1982)). The First Amendment does not protect either obscene speech or child pornography from prosecution. <u>Id.</u> However, speech that is sexually graphic, but not obscene, falls within the protections of the First Amendment. <u>Id.</u> This is true even if the sexually graphic speech contains youthful-looking adult actors or virtual, computer-generated images of children. <u>Id.</u> (citing <u>Ashcroft</u>, 535 U.S. at 239-41). In <u>Ashcroft</u>, the Supreme Court invalidated the Child Pornography Prevention Act of 1996 (CPPA) because the Act criminalized speech that was neither obscene nor child pornography. <u>Ashcroft</u>, 535 U.S. at 256. In doing so, the Court reasoned that materials that were not produced using actual children failed to meet the child-protection rationale needed to justify restricting otherwise-protected speech. <u>Id.</u> at 249-51.

**Overbroad**

Under the First Amendment overbreadth doctrine, a statute is facially invalid if it prohibits a substantial amount of protected speech. <u>Williams</u>, 128 S. Ct. at 1838. The doctrine represents an effort to balance competing social costs. <u>Id.</u> On the one hand, the threat of enforcing an overbroad statute deters people from engaging in constitutionally protected speech, stifling the free exchange of ideas. <u>Id.</u> On the other hand, invalidating a criminal law that is constitutional in some applications has obvious harmful effects. <u>Id.</u> To balance these competing interests, a statute will be found unconstitutional only if it is <u>substantially</u> overbroad, both in an absolute sense and relative to the statute's plainly legitimate sweep. <u>Id.</u>

Mees argues § 1466A(b)(1) is overbroad. In <u>Ashcroft</u>, the Supreme Court found the CPPA overbroad because it prohibited a significant

amount of speech that was not obscene and that was not child pornography. <u>Ashcroft</u>, 535 U.S. at 240, 251.  In contrast to the CPPA, the statute in question only proscribes the knowing possession of materials that depict a minor engaging in sexually explicit conduct and that are obscene.  18 U.S.C. § 1466A(b)(1).  By its plain language, the statute only proscribes the knowing possession of obscene materials. <u>Id.</u>  Obscene materials, as noted above, are not protected by the First Amendment.  <u>Williams</u>, 128 S. Ct. at 1835.  As a result, the "Supreme Court has repeatedly found that statutes that proscribe conduct only with respect to material that is obscene under the <u>Miller</u> test are not overbroad."[1]  <u>United States v. Schales</u>, 546 F.3d 965, 971 (9th Cir. 2008), <u>cert. denied</u>, 129 S. Ct. 1397 (2009); <u>see also</u> <u>United States v. Handley</u>, 564 F. Supp. 2d 996, 1005 (S.D. Iowa 2008) (holding § 1466A(b)(1) necessarily incorporates the <u>Miller</u> test for obscenity and is not overbroad).

By its plain language, § 1466A(b)(1) should be viewed, not as a law against child pornography, but a law against obscenity.  18 U.S.C. § 1466A(b)(1).  The statute therefore only captures materials which are, by their very nature, beyond the bounds of First Amendment protection. <u>See</u> <u>Schales</u>, 546 F.3d at 972.  Simply put, a defendant cannot knowingly possess obscene materials, and, at the same, be engaged in constitutionally protected speech.  <u>See</u> <u>United States v. Whorley</u>, 386 F. Supp. 2d 693, 697 (E.D. Va. 2005), <u>aff'd</u>, 550 F.3d 326 (4th Cir. 2008).  Since § 1466A(b)(1) does not capture any protected speech within its sweep, this section is not overbroad.

---

[1]Under the <u>Miller</u> test, a jury determines whether material is obscene by considering three factors:

> (a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

<u>Miller v. California</u>, 413 U.S. 15, 24 (1973).

## B.  Attack under the Fifth Amendment

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law. U.S. Const. amend. V.  Under the Due Process Clause, a statute can be so vague as to be unconstitutional.  <u>See</u> <u>Williams</u>, 128 S. Ct. at 1845. A statute is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  <u>Id.</u>  At the same time, the Constitution does not require impossible standards, perfect clarity, or precise guidance.  <u>Schales</u>, 546 F.3d at 972.  "[A]ll that is required is that the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices."  <u>Id.</u>

The first half of § 1466A(b)(1) requires a depiction of "a minor engaging in sexually explicit conduct."  18 U.S.C. § 1466A(b)(1)(A). The term "minor" is not defined within the statute itself.  <u>See</u> 18 U.S.C. § 1466(A).  However, the PROTECT Act, in which 18 U.S.C. § 1466A was enacted, defines "minor" as "a person who has not reached 18 years of age."  18 U.S.C. § 25(a)(2); <u>Handley</u>, 564 F. Supp. 2d at 1003.  But even if the statute did not provide a definition, the term "minor" would be given its plain and ordinary meaning.  <u>Handley</u>, 564 F. Supp. 2d at 1003.  According to the Black's Law Dictionary, a minor is a "person who has not reached full legal age; a child or juvenile."  Black's Law Dictionary, 1011 (7th ed. 1999).  Under the circumstances, the term "minor" has both a clear statutory definition and a clear, commonly understood meaning.  The term "minor" is not vague.

Under the definitions section, "sexually explicit conduct" is given the same meaning as it is under 18 U.S.C. § 2256(2)(A) or 18 U.S.C. § 2256(2)(B).  18 U.S.C. § 1466(A)(f).  Under § 2256(2)(A), "sexually explicit conduct," means

    actual or simulated--
    (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;
    (ii) bestiality;
    (iii)masturbation;
    (iv) sadistic or masochistic abuse; or

(v) lascivious exhibition of the genitals or pubic area of any person;

18 U.S.C. § 2256(2)(A).

Under § 2256(2)(B), "sexually explicit conduct," means

(i) graphic sexual intercourse, including genital-genital, oral- genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex, or lascivious simulated sexual intercourse where the genitals, breast, or pubic area of any person is exhibited;
(ii) graphic or lascivious simulated;
    (I) bestiality;
    (II) masturbation; or
    (III) sadistic or masochistic abuse; or
(iii) graphic or simulated lascivious exhibition of the genitals or pubic area of any person;

18 U.S.C. § 2256(2)(B).

Courts have found the definitions for "sexually explicit conduct" in § 2256(2) to be neither vague nor overbroad on several occasions. United States v. Rearden, 349 F.3d 608, 620 (9th Cir. 2003). Accordingly, the phrase "sexually explicit conduct" is not vague.

The second half of § 1466A(b)(1) requires that the depiction be "obscene." 18 U.S.C. § 1466A(b)(1)(B). The term "obscene" is not defined within the statute itself. See 18 U.S.C. § 1466A. However, "federal statutes dealing with obscenity are construed to incorporate the Miller standards. . . ." Schales, 546 F.3d at 973. The Supreme Court has found the Miller test to be clear. Id. Taken together, "the definition of obscenity has survived vagueness challenges in a number of Supreme Court cases." Id. The term "obscene" is not vague.

A statute is not vague just because it may sometimes be difficult to determine whether the incriminating fact (the age of a minor depicted, or instance) has been proved. See Williams, 128 S. Ct. at 1846. Instead, a statute is only vague when it is difficult to determine what the incriminating fact itself is. Id. That is, a statute is vague when the criminal conduct in question rests on subjective judgments, without any statutory definitions, narrowing context, or settled legal meanings. Id. (noting that the Supreme Court has struck down statutes that prohibited "annoying" or "indecent" conduct as unconstitutionally vague).

Section 1466A(b)(1) does not rest on subjective judgments. Its terms are well defined and have settled legal meanings. The language of the statute provides sufficiently definite warning as to the prohibited conduct. Section 1466A(b)(1) is not unconstitutionally vague.

The motion to dismiss the indictment should be denied.

## II. MOTIONS TO SUPPRESS EVIDENCE

From the evidence adduced at the hearing on the motions of defendant to suppress evidence, the undersigned makes the following findings of fact and conclusions of law:

### FACTS

1. On September 12, 2008, St. Louis County Police Detective Mike McCartney, was assigned to the Special Investigations Unit. In this position, Det. McCartney received much training and acquired much experience investigating computer crimes involving child pornography. On that day he interviewed Allison Thomas, the former girlfriend of Matthew Mees. Thomas had gone to the police to report information about Mees. Thomas told Det. McCartney that Mees had told her that he had had sexual relations with his three-year-old niece. Thomas went to the police out of concern for this child.

2. After his interview with Ms. Thomas, late in the evening also on September 12, 2008, Det. McCartney submitted his written, sworn affidavit to St. Louis County Circuit Judge Dale W. Hood, in support of his application for a search warrant for 4229 Ringford, the residence of Matthew Mees. The affidavit described Det. McCartney's extensive expertise, developed through training and experience investigating computer crimes involving child pornography. The affidavit described the information Ms. Thomas provided Det. McCartney. The affidavit stated that Ms. Thomas told the officer about her relationship with Mees which had begun in January 2008. This relationship included romantic and sexual relations with Mees. In this relationship Mees described his sexual fantasies to her (in which she participated with him) and his emailing to her images of child pornography, including a picture of "Mykayla" whom he described as his three-year-old cousin. The affidavit

stated that Ms. Thomas told the officer about her seeing video recordings of Mees performing oral sex on a two- to three-year-old female. The affidavit described Thomas's statements about Mees's statements to her about his sexual and other activities with Mykayla and another minor relative of Mees. The affidavit also described independent investigation by Det. McCartney to corroborate the information provided by Ms. Thomas. This information indicated that Mees was previously convicted of first degree child molestation, is a registered sex offender, resides at 4229 Ringford, and has the email address provided by Ms. Thomas. The affidavit also provided information about the usual activities of those who traffic in images of child pornography. Gov. Ex. 1B. At 11:59 p.m. on September 12, 2008, Circuit Judge Hood signed and issued the search warrant for 4229 Ringford, authorizing a search for evidence of child pornography. Gov. Ex. 1C.

3. Shortly before the search warrant was signed by the issuing circuit judge, around 11:30 p.m. on Friday, September 12, detectives observed Michael Mees and others leave his residence, enter a vehicle, and drive away. The detectives had a marked police car stop Mees in his vehicle near the intersection of Lemay and Forder in St. Louis County, and he pulled into a small neighborhood shopping mall parking lot. The officers had Mees get out of his vehicle. Approximately 40 minutes later, at approximately 12:30 a.m. on Saturday, September 13, St. Louis County Police Det. Adam Cavanaugh arrived at the scene of the stop.

4. Next, Det. Cavanaugh spoke with Mees and orally advised him of his constitutional rights to remain silent and to counsel by reading them to him from a card.[2] The officer asked Mees whether he understood his rights and Mees said, "Yes." Det. Cavanaugh then told Mees about a search warrant for Mees's residence and the interest of the police in interviewing him. Cavanaugh told Mees that, if he would wait at the scene a few minutes, the officer in charge of the investigation would arrive and would want to talk with him. Mees said he would wait for the

---

[2]Det. Cavanaugh testified at the suppression hearing that he did not believe Mees was then under arrest, but was being detained in aid of the execution of the search warrant, and that he had given Mees his <u>Miranda</u> warnings as a precaution for any statement Mees might later give the police.

officer. While with Det. Cavanaugh, Mees did not ask for an attorney or invoke his right to remain silent.

5.    Soon thereafter, Dets. Barbara Lane, Matthew Brillos, and McCartney arrived. Det. Cavanaugh told them he had previously advised Mees of his <u>Miranda</u> rights, and that Mees had waived them and was willing to speak to the police.

6.    Det. Cavanaugh then entered one of the police cars by himself and turned on a hidden audio recording device. Without being told of the recording device, Mees entered the police car with Dets. Brillos and Lane, who interviewed him.[3] Mees was not handcuffed. The police purpose of the interview was to quickly find out whether or not Mees was victimizing a three-year-old girl. Det. Brillos began the interview with Mees saying he thought the interview was about local burglaries the police were investigating. Det. Brillos did not immediately correct Mees's belief about the topic of the interview. Mees affirmed that the other detective had already advised him of his constitutional rights "per <u>Miranda</u>" and that he understood them and agreed to talk with the police. Mees made oral statements to the police in answer to questions which were recorded.[4] The interview began on September 13, 2008, at approximately 12:58 a.m. and lasted approximately 45 minutes. After a few minutes into the interview,[5] Det. Brillos advised Mees that the police were in the process of executing a search warrant at his residence to search for evidence of child pornography.

7.    On several occasions during the interview, the topic of counsel came up.

---

[3]It was then and still is standard operating procedure for St. Louis County Police to audio or video record suspects' interview statements.

[4]See Gov. Exs. 3A (written transcript) and 3B (compact disk). The undersigned has listened to the audio recording of the interview, Government Exhibit 3A. The quotations of the words used in the interview are from the undersigned's review of the audio recording. References to the transcript pages are for the reader's convenience.

[5]See page 8 of the interview transcript.

a.   At page 16 of the transcript, after Mees denied that pornography would be on his computer, but that peer-to-peer software LimeWire was on his computer, the following occurred:

Mees:     I'm just incriminating myself more.

Brillos:  No. No. No. What we're actually trying to do is just to find out what's going on and see, see what's really happening here.  So, I'm not trying to get you to do anything–

Mees:     Then I guess I'm just gonna wait until I get a lawyer and I don't know what else (inaudible).

Brillos:  Okay.  Well let me ask you this, Matt.  Here, here's some of the things that have happened. Your girlfriend's come forward and she's made some accusations.  Some accusations about you and somebody that you know.

Mees:     Okay.

(Gov. Ex. 3B at 16.)

Det. Brillos did not consider Mees's statement to be a clear request for the services of counsel,[6] and proceeded to ask Mees about someone named "Mykayla."  Mees denied knowing anyone named "Mykayla."

b.   At pages 22-23 of the transcript, the following occurred:

Mees:     I guess I need to wait and talk to a lawyer.

Brillos:  Okay, I guess  I need to qualify that.  Are you asking for an attorney?  'Cause there's a couple of important questions I'd like to ask you.  But if, in fact, you're asking for an attorney, I can't ask you that question.  So, can you . . . either qualify whether, in fact, that's what you're asking for?  Or do you want to wait and hear some of my questions that are kind of important?

Mees:     Well, well what was, what uh.

Brillos:  First, can you answer that question?

Mees:     [No answer.]

Brillos:  And if you feel like later you want to go ahead and have that request, you feel free at any time

_____

[6]He so testified at the evidentiary hearing.

> to do that, OK?  But I, I need to, qualify whether, in fact, you are asking for an attorney at this time or you're not.

c.   Then, the following occurred:

Mees:     Well, I asked the other gentleman immediately for an attorney.  So, I don't understand.  But I didn't. . . .

Brillos:  What other gentleman?

Mees:     The, your supervisor.

Brillos:  OK, well.  I can tell you, Matt, when I got into the car, I actually asked you that question, so, um, that's fine, but, but again, what I'm gonna do is I'm gonna go ahead and ask you, ah.  I obviously have some important questions that I'd like to ask you, but I want to qualify, whether, in fact, you are asking for an attorney or not, or if you want to wait and exercise that option at a later time. It's up to you.

Mees:     You can continue.

Brillos:  OK.  So, it's OK for you to talk to me at this time.  Is that accurate?

Mees:     Correct.

(Id. at 22-23.)  Det. Brillos then continued questioning Mees about his relationship with Allison Thomas and whether or not a female child victim existed.

d.   At pages 27-28 of the transcript, after approximately 45 minutes of the interview, the following occurred:

Mees:     So, I have no bargaining power.  Not bargaining power.  That didn't come out right.  That made it sound like  . . . I mean I don't know what to say. I don't, I don't know whether I should wait for an attorney.  I don't know.

Brillos:  OK.  And I totally understand that and I really can empathize with your situation, but I don't think it, it has anything to do with anything if you at least tell us how you, uh, led some chick you dated on and made her believe stuff.  It's all."

(<u>Id.</u> at 27-28.)  Mees continued providing information and answering questions.

        e.    At page 34 of the transcript, the following occurred:

Mees:      Is there any way we can get a hold of my probation officer?

Brillos:    Uh.

Mees:      And I could talk to her?

Brillos:    No, cause I, I'll be honest with you.  I don't really particularly like probation officers because my theory is this:  A lot of times they just want to, uh, jam guys up and I'm not trying to jam you up.  And I'd rather just have a conversation with you.

Mees:      Well.  I mean, I'm gonna get jammed up, obviously.

Brillos:    Well.  Well, here's the thing.  Here's, the important thing is we need to first make sure that, that isn't you in the video with a three-year-old.

(<u>Id.</u> at 34.)  Mees then continued to answer questions and make statements.

        f.    At pages 37-38 of the transcript, the following occurred:

Brillos:    OK.  Here's one of the things that she [(Allison Thomas)] said, Matt.  She said that, that persona that you're saying you created, uh, was encouraging her to, uh, have sex with a three-year-old named Mykayla.  And then you guys went as far as setting up a couple of dates that were gonna actually occur when you guys were gonna have sex with this alleged child.  Is that accurate?

Mees:      I'm gonna have to talk to a lawyer before I answer anything else.  I mean, I. . . .

Brillos:    OK.

Mees:      I'm just getting (inaudible).

Brillos:    OK.  I need.  I need.  Again, I'm gonna have to qualify what you're actually asking.  Are you asking for any attorney or are you gonna allow me to ask you more questions?  I can tell you if you

>           are asking for an attorney, that is your right and
>           we're gonna go ahead and let you have that right,
>           as we have afforded you the entire time.  However,
>           I won't be asking you any more questions.  So,
>           again it's your choice.  Are you asking for an
>           attorney at this time?

     Mees:      Yes.

(Id. at 37-38.)  At that time, 1:36 a.m. on September 13, 2008, Det. Brillos stopped questioning Mees and formally placed Mees under arrest for possession and distribution of child pornography.  (Id. at 38.)

     8.   After his arrest Mees was taken to the St. Louis County Justice Center.  At no time was Mees told his oral statements in the police car were being recorded or had been recorded.

     9.   While Det. Cavanaugh was escorting Mees in the Justice Center for booking, Mees, without being asked any question, orally stated, "I am never going to change."  Det. Cavanaugh replied by saying something to the effect that he guessed therapy would not work.  Thereafter, without questions being asked of him, Mees made other oral statements to the officer.  Sometime thereafter, Mees was released from state custody.[7]

     10.  At no time did the police coerce Mees or make him any promise to induce him to cooperate and to make statements.

     11.  The following Monday, September 15, 2008, Det. Brillos met with Mees's state probation officer in Mees's presence.  Mees's girlfriend, Sandra Bagi, had driven him to the probation office in an automobile.  The probation officer told the Det. Brillos that Mees had admitted to him that he had child pornography on his cell phone.  Det. Brillos then asked Ms. Bagi whether she would give him permission to enter her automobile to search for Mees's cell phone.  She agreed and Det. Brillos found and seized the phone.

     12.  On October 22, 2008, Det. McCartney applied for and received a search warrant to search the data recorded on Mees's cell phone.  In support of his application, Det. McCartney submitted his sworn, written

---

[7]Mees's release from custody is deduced from the fact that on September 15, 2008, his girlfriend drove him to the state probation office.  (See Finding 11.)

affidavit to St. Louis County Circuit Judge Maura B. McShane, Government Exhibit 2B.  In his affidavit, Det. McCartney described his experience and training and service with the St. Louis County Police Department Special Investigations Unit.  The affidavit stated that he had acquired much training and experience investigating computer-based internet crimes involving child pornography and exploitation.  The affidavit also described the information provided by Allison Thomas to the police about her relationship with her boyfriend Matthew Mees and his sexual involvement with a three-year-old female named Mykayla.  The affidavit described Mees's prior criminal record and the interview statements Mees made to the police on September 12, 2008.  The affidavit described the information provided by Mees's probation officer about Mees's statements about himself, his proclivity toward child pornography, and his having child pornography on his cell phone.  The affidavit also described the seizure of the subject cell phone from the automobile of Sandra Bagi. The affidavit also recounted the affiant's knowledge from training and experience about the likelihood that Mees's cell phone, which was seized by the police on September 15, 2008, would contain data and records of internet usage and child pornography.  Gov. Ex. 2B.

13.  At 10:20 a.m. on October 22, 2008, Judge McShane issued her search warrant for Mees's cell phone.  Gov. Ex. 2C.


DISCUSSION

Defendant argues that the physical evidence and his statements should be suppressed.


**A.  Fourth Amendment Issues**

**1.    Search Warrant for 4229 Ringford**

The Fourth Amendment to the Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ."  U.S. Const. amend. IV.  To secure these rights, the Fourth Amendment provides "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  Id.  The goal of the Fourth Amendment is to

ensure that a search will be carefully tailored to its justifications, and will not become a wide-ranging exploratory search. <u>Maryland v. Garrison</u>, 480 U.S. 79, 84 (1987). The particularity requirement serves this goal by preventing general "rummaging in a person's belongings" and preventing "the seizure of one thing under a warrant describing another." <u>Andresen v. Maryland</u>, 427 U.S. 463, 480 (1976). Whether or not to seize an item is not within the discretion of the officer executing the warrant. <u>Id.</u>

The issue before this court when reviewing the validity of the issuance of a search warrant by another court is whether the supporting materials gave the issuing judge a substantial basis for concluding that probable cause existed for the issuance of the warrant. <u>United States v. Luloff</u>, 15 F.3d 763, 768 (8th Cir. 1994); <u>United States v. Peterson</u>, 867 F.2d 1110, 1113 (8th Cir. 1989); <u>United States v. Martin</u>, 866 F.2d 972, 976 (8th Cir. 1989) (citing <u>Illinois v. Gates</u>, 462 U.S. 213, 238-39 (1983)). Probable cause means a "fair probability that . . . evidence of a crime will be found in a particular place," given the circumstances set forth in the affidavit. <u>United States v. Horn</u>, 187 F.3d 781, 785 (8th Cir. 1999) (quoting <u>Illinois v. Gates</u>, 462 U.S. at 238).

On September 12, 2008, Circuit Judge Hood issued a search warrant for 4229 Ringford. In support of the application for the search warrant, Det. McCartney submitted a written, sworn affidavit. The affidavit described Det. McCartney's extensive experience with computer crime and the information he had received from Allison Thomas, Mees's former girlfriend. That information included details about (1) Mees emailing images of child pornography to Thomas, (2) a video recording that featured Mees performing oral sex on a two- or three-year old, and (3) Mees stating that he had engaged in such acts with at least one other child. The affidavit also described McCartney's investigation to corroborate the information Thomas provided.

Under the circumstances, the affidavit provided the issuing judge a substantial basis for finding probable cause and issuing the warrant authorizing the search of 4229 Ringford.

**2.    Search Warrant for the Data within Mees's Cell Phone**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." U.S. Const. amend. IV. The prohibition against unreasonable searches and seizures does not apply where voluntary consent has been given. <u>Illinois v. Rodriguez</u>, 497 U.S. 177, 181 (1990); <u>United States v. Brown</u>, 345 F.3d 574, 579 (8th Cir. 2003). The consent exception applies to vehicle searches. <u>Brown</u>, 345 F.3d at 579.

In this case, the probation officer told Det. Brillos that Mees had admitted to having child pornography on his cell phone. Det. Brillos became aware that the cell phone was located in Sandra Bagi's car, and asked for her permission to search the car. Bagi gave her consent, and found and seized Mees's phone. Under the well-recognized consent exception, the search of Bagi's car and the seizure of the cell phone did not violate the Fourth Amendment.

Having seized the phone, Det. Brillos applied for a search warrant to search the contents of the cell phone. On October 22, 2008, Judge McShane issued a search warrant for the recorded data within the phone. In support of the application for the search warrant, Det. McCartney submitted a written, sworn affidavit. The affidavit contained the same information as the previous affidavit, as well as information about Mees's statement to the probation officer about the presence of child pornography on his cell phone.

Under the circumstances, the affidavit provided a substantial basis for the finding of probable cause and the issuance of the warrant authorizing the search of the data recorded on Mees's cell phone.

### B.  Fifth Amendment Issues

**1.  Mees's Interview Statements**

The Fifth Amendment to the Constitution protects an individual from being compelled to be a witness against himself in a criminal case. U.S. Const. amend. V.  To safeguard an individual's Fifth Amendment rights, a suspect in custody must be warned before being interrogated that he has the rights to remain silent and to counsel. <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966). The safeguards described in <u>Miranda</u>

only apply when a suspect is in custody. <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977) (per curiam). Statements made after a knowing and voluntary waiver of <u>Miranda</u> rights are admissible unless there were earlier, unwarned statements resulting from coercion or a calculated effort to undermine the suspect's free will. <u>United States v. Briones</u>, 390 F.3d 610, 614 (8th Cir. 2004).

In this case, Det. Cavanaugh orally advised Mees of his constitutional rights to remain silent and to counsel. Mees acknowledged these rights and indicated he was willing to speak to police. Indeed, Mees provided answers to questions posed by Dets. Brillos and Lane while in the patrol car.

These responses constituted a waiver of his rights. <u>See</u> <u>North Carolina v. Butler</u>, 441 U.S. 369, 372-76 (1979). Prior to his making these statements and when he made them, Mees was not the subject of any duress, coercion, or threat of punishment. His statements were made voluntarily and responsively, and were not induced by any improper government action. <u>See</u> <u>United States v. LeBrun</u>, 363 F.3d 715, 724 (8th Cir. 2004) (en banc). Accordingly, Mees's statements to the officers after he was read his <u>Miranda</u> rights may be used against him without violating his Fifth Amendment rights, unless he invoked his right to counsel sometime during the questioning.

Mees argues that the police should have informed him that his statements in the patrol car were being recorded. However, a suspect has no reasonable expectation of privacy in the statements he makes while in a patrol car. <u>United States v. Clark</u>, 22 F.3d 799, 802 (8th Cir. 1994). The act of secretly taping Mees's statements does not implicate any constitutional concerns. <u>See</u> <u>id.</u>

Mees also argues that the police questioning violated <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004). In <u>Seibert</u>, the Supreme Court expressed concern at the police practice of giving "midstream" <u>Miranda</u> warnings. 542 U.S. at 604. This practice called for police to interrogate a defendant without <u>Miranda</u> warnings until the interrogation produced a confession. <u>Id.</u> At that point, the police would administer the warnings and repeat the process to obtain the same confession - only this time, after warning the defendant of his rights. <u>Id.</u>

In this case, the police did not engage in this "midstream" practice. Instead, the police advised Mees of his constitutional rights to remain silent and to counsel before they ever asked him any questions. Seibert is therefore inapposite. Finally, because the police had already advised Mees of his Miranda rights, they had no obligation to repeat the Miranda warnings once Mees entered the patrol car. See United States v. Pruden, 398 F.3d 241, 246 (3d Cir. 2005); see also United States v. Nordling, 804 F.2d 1466, 1471 (9th Cir. 1986) (finding police did not need to administer new Miranda warnings where no appreciable time had elapsed after the initial set of warnings).

**Invocation of Counsel**

As noted above, a suspect in custody must be warned, before being interrogated, that he has the right to remain silent, the right to consult with an attorney, and the right to have an attorney present during the questioning. Davis v. United States, 512 U.S. 452, 457 (1994); Miranda, 384 U.S. at 444. The police must explain these rights to the suspect before questioning him. Davis, 512 U.S. at 457. If the suspect effectively waives his right to counsel, as Mees did here, then law enforcement officers are free to question the suspect. Id. Once questioning begins, the suspect may still invoke his right to counsel. See id. And once the suspect requests a lawyer, the police must stop their questioning until an attorney is actually present, or until the suspect reinitiates the conversation. Id.

To invoke the right to counsel and end questioning, the suspect must unambiguously request a lawyer. Id. at 459. "[H]e must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id. An ambiguous or equivocal reference to an attorney will not be sufficient to require the cessation of police questioning. Id. In addition, the officers have no obligation to ask the suspect to clarify an ambiguous statement. Id. at 461-62. "Unless the suspect actually requests an attorney, questioning may continue." Id. at 462 (finding the statement, "Maybe I should talk to a lawyer," was not an unambiguous request for counsel);

see also <u>Clark v. Murphy</u>, 331 F.3d 1062, 1070 (9th Cir. 2003) (finding the statement, "I think I would like to talk to a lawyer," was not a clear request for counsel); <u>Dormire v. Wilkinson</u>, 249 F.3d 801, 805 (8th Cir. 2001) (finding the statement, "Could I call my lawyer?" was not a clear request for counsel); <u>Burket v. Angelone</u>, 208 F.3d 172, 198 (4th Cir. 2000) (finding the statement, "I think I need a lawyer," was not a clear request for counsel); <u>but see</u> <u>United States v. Lee</u>, 413 F.3d 622, 626 (7th Cir. 2005) (finding the statement, "Can I have a lawyer?" was a proper request for counsel); <u>Kyger v. Carlton</u>, 146 F.3d 374, 379 (6th Cir. 1998) (finding the statement, "I'd just as soon have an attorney [because] . . . there's been a shooting involved and that's a serious charge," was a proper request for counsel).

**Mees's First Reference to Counsel (Finding 7(a))**

After initially waiving his <u>Miranda</u> rights, Mees responded to the questions from the officers. However, there were several points during the interview when Mees mentioned the topic of counsel. After expressing some concern that he was providing incriminating statements, Mees stated, "Then I guess I'm just gonna wait until I get a lawyer and I don't know what else (inaudible)."

The statement "I guess," is an equivocal response. <u>See</u> <u>Culkin v. Purkett</u>, 45 F.3d 1229, 1233 (8th Cir. 1995) (referring to witness's "'I guess' response" as "equivocal"). <u>Cf.</u> <u>United States v. Nelson</u>, 450 F.3d 1201, 1212 (10th Cir. 2006) (referring to defendant's statement, "I guess I'm ready to go to jail then," as, at best, an ambiguous or equivocal invocation of his right to remain silent). Taken together, when a defendant mentions counsel, but prefaces those remarks with the statement "I guess," courts have been reluctant to find such a statement to be a clear invocation of the right to counsel. <u>See</u> <u>Tucker v. State</u>, 491 S.E.2d 420, 421-22 (Ga. Ct. App. 1997) (finding the statement, "I guess I need a lawyer because I wasn't even there when that happened," was not a clear invocation of the right to counsel); <u>Taylor v. State</u>, 689 N.E.2d 699, 703 (Ind. 1997) (finding the statement, "I guess I really want a lawyer, but, I mean, I've never done this before so I don't know," expressed doubt, and was not a clear invocation of the

right to counsel); <u>State v. Santiago</u>, 2008-Ohio-4545, at ¶¶ 14-15 (Ohio Ct. App. 2008) (finding the statement, "I guess I have to talk to [the lawyers] because I don't know what to answer yes or no," was not a clear invocation of the right to counsel); <u>but see</u> <u>State v. Haslett</u>, --- S.W.3d ----, No. SD 28572, 2009 WL 103992, at *11 (Mo. Ct. App. Jan. 16, 2009) (noting that the officer "correctly terminated" questioning after the defendant stated, "I guess I probably need an attorney then").

In reaching these decisions, the courts have found very little difference between qualifying clauses like "I guess" or "I think," and the use of "maybe I should" in the <u>Davis</u> decision. <u>Clark</u>, 331 F.3d at 1070; <u>Burket</u>, 208 F.3d at 198; <u>Tucker</u>, 491 S.E.2d at 421-22; <u>Santiago</u>, 2008-Ohio-4545, at ¶ 15. Indeed, under <u>Davis</u>, if a suspect makes a reference to an attorney that is ambiguous or equivocal, police questioning can continue. <u>Davis</u>, 512 U.S. at 459. As noted above, the use of "I guess" is equivocal. Accordingly, the statement, "Then I guess I'm just gonna wait until I get a lawyer and I don't know what else," was not a clear invocation of the right to counsel.

**Mees's Second Reference to Counsel (Finding 7(b))**

Later in the interview, Mees again made a reference to counsel. This time, he stated, "I guess I need to wait and talk to a lawyer." This statement was also qualified with the equivocal phrase "I guess." For the reasons stated above, this second reference to counsel was not a clear invocation of the right to counsel.

**Mees's Third Reference to Counsel (Finding 7(c))**

After making his second reference to counsel, Det. Brillos asked Mees to clarify whether or not he was asking for an attorney. In response to this line of inquiry, Mees made a third reference to counsel. He noted, "Well, I asked the other gentleman immediately for an attorney. So, I don't understand."

Unlike his previous two statements, this statement was unequivocal. It did not contain any qualifying or ambiguous phrases. <u>See</u> <u>Clark</u>, 331 F.3d at 1070 (noting that certain qualifying phrases create an equivocal statement). It was not phrased as an independent question; he was not

asking whether he should obtain an attorney, how he could obtain an attorney, or how long it would take to appoint an attorney. See Soffar v. Cockrell, 300 F.3d 588, 595 (5th Cir. 2002) (en banc) (noting that statements falling within these three categories are not clear invocations of the right to counsel); see also United States v. Kelly, 329 F.3d 624, 627, 630 (8th Cir. 2003) (finding the statement, "Do you know any good attorneys?" was not a clear request for counsel).

Instead, Mees declared, in clear, declarative language, that it was his impression that he had already requested an attorney - and therefore, did not understand what more he had to do to obtain counsel. More to the point, this statement came on the heels of two previous references to counsel. See Alvarez v. Gomez, 185 F.3d 995, 998 (9th Cir. 1999) (finding the defendant's "thrice-repeated questions [concerning counsel], when considered together, constituted an unequivocal request for an attorney"). These three statements should be considered together. See id.; United States v. Ford, No. CRIM 5:06 CR 14 DCB-JCS, 2006 WL 2884534, at *2 (S.D. Miss. Oct. 10, 2006) (noting that the court "may consider the circumstances immediately surrounding the alleged invocation").

A defendant must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Davis, 512 U.S. at 459. Mees's third reference to counsel meets this standard. Mees declared in clear language that he did not understand the situation, and that he believed he had already requested an attorney. These two statements, taken together and viewed in the context of the earlier references to counsel, clearly indicate that Mees wanted a lawyer. See Ford, 2006 WL 2884534, at *2 ("When viewed in light of the surrounding circumstances, [the defendant's] statement can only be interpreted in one way: He wanted a lawyer."); see also Davis, 512 U.S. at 549 (The invocation of the right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.").

A defendant does not have to invoke counsel "with the discrimination of an Oxford don." Davis, 512 U.S. at 459. His

invocation only needs to be sufficiently clear that a "reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id. Mees's third reference to counsel was clear and unequivocal. It was not phrased as a question and was not ambiguous. When viewed in light of the surrounding statements, Mees's third statement satisfies this standard.

Mees adequately expressed his desire to have an attorney at his side. Having done so, all police questioning had to stop until Mees was presented with a lawyer, or until Mees himself initiated subsequent communication. Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). The simple act of responding to more questions by the police does not act to waive this right. Id. This is true even if the police advise the defendant of his rights. Id. "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." Id.

Following Mees's reference to counsel, Det. Brillos asked Mees if he was willing to continue. Mees said he was, and continued answering Det. Brillos's questions. Under Edwards, this was not a valid wavier of Mees's right to counsel. Because Det. Brillos initiated further questioning, Mees's responses to these questions are inadmissible. Id. at 485 ("[I]t is inconsistent with Miranda and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel."). Under Edwards, all of Mees's statements made after his invocation of counsel are inadmissible and should be suppressed.

In its response, the government does not raise the issue of custody. The government does not argue that Mees was not in custody at the time he invoked his right to counsel. (Doc. 23.) But regardless of whether Mees was in custody or not, the statements should be suppressed.

The procedural safeguards of Miranda are not, on their own, rights protected by the Constitution. Hannon v. Sanner, 441 F.3d 635, 637 (8th Cir. 2006). As a result, a defendant cannot invoke his "Miranda rights

anticipatorily, in a context other than 'custodial interrogation.'"
McNeil v. Washington, 501 U.S. 171, 182 n.3 (1991).  Taken together, a
number of cases have found the protections of Edwards do not apply to
non-custodial interrogations.  United States v. Hampton, 153 F. Supp.
2d 1262, 1273 (D. Kan. 2001); see also United States v. Martin, 95 F.
App'x 169, 178 n.8 (6th Cir. 2004) ("A number of circuits have also held
that Miranda rights may be invoked only when an individual is subjected
to interrogation while in custody.").

     An interrogation can remain non-custodial even after the police
have given Miranda warnings.  United States v. Harris, 221 F.3d 1048,
1051 (8th Cir. 2000).  That is, several courts have found that reading
a suspect his Miranda rights, in a non-custodial situation, does not
afford the suspect any of those rights because the reading is
technically unnecessary.  Id.  Other courts, meanwhile, have suggested
that reading the Miranda rights transforms a non-custodial interrogation
into a custodial interrogation.  Id.  For its part, the Eighth Circuit
has not decided the issue, though it expressed reluctance to adopt the
transformation argument.  Id.

     In this case, the police stopped Mees late one night, while he was
driving his vehicle.  About forty minutes after the stop, Det. Cavanaugh
read Mees his Miranda rights.   Shortly thereafter, police began
questioning Mees in the back of a patrol car.  During this questioning,
Mees invoked his right to counsel.  When police have informed a suspect
of his Miranda rights, and the suspect clearly invokes one of those
rights, the court believes that the police must honor that right -
irrespective of the actual custodial situation.  See United States v.
Bautista, 145 F.3d 1140, 1151 (10th Cir. 1998) ("[L]aw enforcement
officers are not free to give the Miranda warning and then blatantly
ignore a suspect's attempt to invoke any right thereunder.").   A
contrary holding would serve to eviscerate the suspect's belief in these
important rights, and would lend a coercive atmosphere to further police
questioning.  Tukes v. Dugger, 911 F.2d 508, 516 n.11 (11th Cir. 1990)
("If the state were free to tell a suspect that he had the right to an
appointed lawyer, but could, while continuing to interrogate, refuse to
provide the lawyer on the ground that the suspect was not actually in

custody, the suspect would be led to believe that no request for counsel would be honored.  The coercive effect of continued interrogation would thus be greatly increased. . . .").

Any statements Mees made after invoking his right to counsel (see Finding 7(c)) should be suppressed.

## 2.    Mees's Statements in the Justice Center

The protections of <u>Miranda</u> and the Fifth Amendment only extend to custodial interrogation.  <u>United States v. Londondio</u>, 420 F.3d 777, 783 (8th Cir. 2005).  A defendant's voluntary statements that are not in response to police questioning are admissible with or without the <u>Miranda</u> warnings.  <u>Id.</u>  This rule applies even after a defendant has invoked his right to counsel.  <u>Edwards</u>, 451 U.S. at 485.  In other words, nothing in the Fifth and Fourteenth Amendments prohibits the police from listening to a defendant's voluntary, volunteered statements, and using those statements against him at trial.  <u>Id.</u>

While Det. Cavanaugh was escorting Mees for booking, Mees spontaneously stated, "I am never going to change."  Mees volunteered a few other statements, none of which were in response to a police question.  Because these statements were spontaneous and not in response to police questioning, all of Mees's statements that were made in the Justice Center are admissible.  <u>See</u> <u>United States v. Chipps</u>, 410 F.3d 438, 445 (8th Cir. 2005) (holding defendant's statements were admissible as spontaneous statements because they were not in response to any police questioning).

<u>RECOMMENDATION</u>

For the reasons stated above,

**IT IS HEREBY RECOMMENDED** that the motion of defendant Matthew Mees to dismiss Count 2 of the indictment because it is based on an unconstitutional statute (Doc. 21) be denied.

**IT IS FURTHER RECOMMENDED** that the motion of defendant Matthew Mees to suppress evidence and statements (Docs 13 oral motion, and 22 documentary motion) should be granted in part, and otherwise denied. Mees's statements made during the interview, and after his third

reference to counsel (Finding 7(c) should be suppressed.  All other evidence and statements should be admitted.

**IT IS FURTHER RECOMMENDED** that the motion of the government for a determination of the admissibility or not of any arguably suppressible evidence (Docs. 10 documentary motion and 14 oral motion) should be denied as moot.

The parties are advised they have ten days to file documentary objections to this Report and Recommendation.  The failure to file timely documentary objections may waive the right to appeal issues of fact.


                                                 /S/   David D. Noce
                                       **UNITED STATES MAGISTRATE JUDGE**


Signed on May 5, 2009.